**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | |
|---|---|
| **KAREN MERROW, THOMAS JORDAN,** **and MICHAEL CROSS, on behalf of the** **P.L. Marketing, Inc. Employee Stock** **Ownership Plan, and on behalf of a class of** **all other persons similarly situated,** | |
| **Plaintiffs,** | **Case No. 2:22-cv-00123-DLB-CJS** |
| **v.** | |
| **HORIZON BANK d/b/a/ HORIZON** **TRUST & INVESTMENT** **MANAGEMENT, THOMAS J. SCHUH,** **and TIMOTHY M. LOGSDON,** | |
| **Defendants.** | |

## AMENDED COMPLAINT

Plaintiffs Karen Merrow, Thomas Jordan, and Michael Cross, by their undersigned

attorneys, on behalf of the P.L. Marketing, Inc. Employee Stock Ownership Plan, and similarly

situated participants in the Plan and their beneficiaries, allege upon personal knowledge, the

investigation of their counsel, their counsel's knowledge and experience in ESOPs and the

practices of ESOP trustees and their advisors, and upon information and belief as to all other

matters, as to which allegations they believe substantial evidentiary support will exist after a

reasonable opportunity for further investigation and discovery, as follows:

## BACKGROUND

1.     Plaintiffs Karen Merrow, Thomas Jordan, and Michael Cross ("Plaintiffs") bring

this suit against Horizon Bank d/b/a Horizon Trust & Investment Management ("Horizon"), the

fiduciary trustee for the P.L. Marketing, Inc. Employee Stock Ownership Plan (the "Plan" or the

1

"ESOP") when the Plan acquired shares of P.L. Marketing, Inc. ("PLM") in 2017; and Thomas J. Schuh and Timothy M. Logsdon ("Selling Shareholders"), the party in interest shareholders from whom the Plan acquired the stock.

2.      Plaintiffs are participants, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan who were vested under the terms of the Plan in shares of PLM allocated to their accounts in the Plan.

3.      This action is brought under Sections 404, 406, 409, and 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1104, 1106, 1109, and 1132(a), for losses suffered by the Plan and its participants caused by Horizon when it caused the Plan to buy shares of PLM for more than fair market value, and other plan-wide relief.

4.      As alleged below, the Plan has been injured and its participants have been deprived of hard-earned retirement benefits resulting from Defendants' violations of ERISA.

5.      At all relevant times, PLM was a privately held company and a party in interest to the Plan. PLM adopted the Plan effective January 1, 2017. On June 6, 2017, the Plan, through its trust, the P.L. Marketing, Inc. ESOP Trust ("ESOT"), purchased from the party in interest Selling Shareholders, directly or indirectly, 1,000,000 shares of PLM's common stock for $53,000,000, which was financed by a loan from PLM of $53,000,000 with an interest rate of 3.50% annually to be repaid over 20 years (the purchase and loan transactions together, the "ESOP Transaction" or "Transaction").

6.      As a result of the ESOP Transaction, PLM became 100% owned by the ESOP and the PLM employees who participated in it.

7. Horizon represented the Plan and its participants as fiduciary trustee in the ESOP Transaction. It had sole and exclusive authority to negotiate the terms of the ESOP Transaction and to authorize the Transaction on the Plan's behalf. The stock and loan transactions that Horizon caused the Plan to enter into with parties in interest are *per se* violations of ERISA's prohibited transaction rule, ERISA § 406(a), 29 U.S.C. § 1106(a).

8. The ESOP Transaction allowed Selling Shareholders to unload their interests in PLM above fair market value, for the reasons explained below, and saddle the Plan with tens of millions of dollars of debt over a 20-year repayment period to finance the Transaction. Horizon failed to fulfill its ERISA duties, as trustee and fiduciary, to the Plan and its participants, including Plaintiffs.

9. Selling Shareholders are parties in interest who sold shares in the ESOP Transaction and received proceeds from the Transaction. Selling Shareholders are liable under ERISA for knowingly participating in the prohibited stock transaction and Horizon's breaches of fiduciary duty under ERISA.

10. Through this action, Plaintiffs seek to enforce their rights under ERISA and the Plan, to recover the losses incurred by the Plan and the improper profits realized by Defendants resulting from their causing prohibited transactions and breaches of fiduciary duty or knowingly participating in prohibited transactions and breaches of fiduciary duty, and equitable relief, including reformation of ESOP Transaction contracts, rescission of the ESOP Transaction, enjoining Horizon and its current or former personnel who approved the ESOP Transaction from acting as a fiduciary for any employee benefit plan that covers or includes any PLM employees or members of the Class, and removing as Plan trustee any purchaser of Horizon's ESOP business and/or any trustee appointed by Selling Shareholders, including but not limited to

3

GreatBanc Trust Company, as well as any former personnel of Horizon who approved the ESOP

Transaction, and appointing an independent fiduciary as Plan trustee. Plaintiffs request that these

prohibited transactions be declared void, Defendants be required to restore any losses to the Plan

arising from their ERISA violations, Defendants be ordered to disgorge to the Plan any improper

profits, and any monies recovered for the Plan to be allocated to the accounts of the Class

members.

## JURISDICTION AND VENUE

11.     This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is

brought by Plaintiffs under ERISA § 502(a), 29 U.S.C. § 1132(a), to require Horizon to make

good to the Plan losses resulting from its violations of the provisions of Title I of ERISA, to

obtain appropriate equitable relief against Horizon and Selling Shareholders, to restore to the

Plan any profits that have been made by breaching fiduciaries and parties in interest through the

use of Plan assets in violation of ERISA, and to obtain other appropriate equitable relief and

legal remedies in order to redress violations and enforce the provisions of ERISA.

12.     This Court has subject matter jurisdiction over this action pursuant to ERISA

§ 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because the Plan is administered in this District, because some of the events or

omissions giving rise to the claims occurred in this District, and because one or more Defendants

reside or may be found in this District. The Plan is administered in Newport, Kentucky.

## PARTIES

14.     Plaintiff Karen Merrow is and has been a Plan participant, as defined in ERISA

§ 3(7), 29 U.S.C. § 1002(7), since the adoption of the Plan effective on January 1, 2017. Plaintiff

Merrow resides in Milledgeville, Georgia. She held several positions at PLM, the most recent being a Retail Merchandising Manager. She was employed there from 2004 to 2019. She was vested in shares of PLM in her Plan account.

15.     Plaintiff Thomas Jordan is and has been a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since the adoption of the Plan effective on January 1, 2017. Plaintiff Jordan resides in Marietta, Georgia. He was a Set Team Member at PLM. He was employed there from 2015 to 2020. He was vested in shares of PLM in his Plan account.

16.     Plaintiff Michael Cross is and has been a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since the adoption of the Plan effective on January 1, 2017. Plaintiff Cross resides in Alexander, Arkansas. He was a Set Team Member at PLM. He was employed there from August 2014 to December 2020. He was vested in shares of PLM in his Plan account.

17.     Defendant Horizon Bank is an Indiana commercial bank that provides investment management services, offering estate and retirement planning, financial management, and trust services. Its headquarters is at 515 Franklin St., Michigan City, Indiana 46360.

18.     Horizon was the Trustee of the Plan at the time of the ESOP Transaction. Horizon was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1102(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. As Trustee, Horizon was a named fiduciary, within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), under the terms of the Plan document.

19.     Defendant Thomas J. Schuh was at the time of the ESOP Transaction the President, the Treasurer, and a Director of PLM. He was a selling shareholder in the ESOP Transaction. He resides or may be found in this District. He resides in Villa Hills, Kentucky, and is a Director of PLM, headquartered in Newport, Kentucky.

20.     Defendant Thomas J. Schuh was a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), at the time of the ESOP Transaction as a PLM officer, director, and 10 percent or more shareholder of PLM, directly or indirectly. Defendant Schuh was also a party in interest to the Plan at the time of the ESOP Transaction as an officer or director, or as an individual having powers or responsibilities similar to those of officers or directors, of 360 Merchandising Solutions, LLC ("360 Merchandising"), a PLM subsidiary whose employees are also covered by the Plan.

21.     Defendant Timothy M. Logsdon was at the time of the ESOP Transaction the Secretary, the Vice President, and a Director of PLM. He was a selling shareholder in the ESOP Transaction. He resides or may be found in this District. He resides in Union, Kentucky, and is a Director of PLM, headquartered in Newport, Kentucky.

22.     Defendant Timothy M. Logsdon was a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), at the time of the ESOP Transaction as a PLM officer, director, and 10 percent or more shareholder of PLM, directly or indirectly. Defendant Logsdon was also a party in interest to the Plan at the time of the ESOP Transaction as an officer or director, or as an individual having powers or responsibilities similar to those of officers or directors, of 360 Merchandising.

## FACTUAL ALLEGATIONS

23.     Founded in 1989, PLM bills itself as a company assisting the sales and merchandising of Corporate Brand consumer products for The Kroger Company, the nation's largest supermarket retailer, and providing a multitude of merchandising and operational services for Kroger's General Office, divisions, and stores. Kroger is PLM's only client. PLM's headquarters is in Newport, Kentucky, minutes from The Kroger Company's General Office. In addition to its Newport location, PLM has representation in Kroger division offices throughout the Midwest and South.

24.     PLM was incorporated in Ohio on July 24, 1989.

25.     PLM is headquartered at Riverfront Place, 300 Dave Cowens Drive, 8th Floor, Newport, Kentucky 41071. That address is listed as the Plan Administrator's address in the Plan's Summary Plan Description dated June 2017 ("SPD").

26.     PLM stock is not and never was readily tradeable on an established securities market.

27.     360 Merchandising was formed in Kentucky in December 2016 as a wholly owned subsidiary of PLM. 360 Merchandising is a Grocery/ Perishables/ HBC (health and beauty care) Broker exclusive to Kroger. 360 Merchandising is headquartered at Riverfront Place, 300 Dave Cowens Drive, Suite 1005, Newport, Kentucky 41071. 360 Merchandising states it "was developed to focus on the strategic growth of our clients' consumer products portfolio at Kroger -the nation's largest grocery retailer. We work directly with the Kroger Category Managers & Procurement Managers to bring the highest quality grocery, frozen, dairy & non-foods brands to the shelf for consumers."

28.     PLM adopted the Plan with an effective date of January 1, 2017.

7

29.     The Plan is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C.

§ 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).

30.     The Plan is a leveraged employee stock ownership plan, or "Leveraged ESOP."

The Plan was designed to invest primarily in the employer securities of PLM.

31.     The Plan's principal asset was PLM stock at all times since the ESOP

Transaction.

32.     The Plan is an individual account plan, or defined contribution plan, under which

a separate individual account was established for each participant.

33.     Employees of PLM and 360 Merchandising are covered by and participate in the

Plan.

34.     PLM is and was from the inception of the Plan the sponsor of the Plan within the

meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

35.     The Plan's Forms 5500 identify PLM as the sponsor and administrator of the

Plan.

36.     The Plan's SPD discloses that PLM is the administrator of the Plan.

37.     PLM is and was the Plan's administrator within the meaning of ERISA

§ 3(16)(A), 29 U.S.C. § 1002(16)(A).

38.     PLM is and was an ERISA fiduciary to the Plan as its administrator.

39.     PLM is a named fiduciary under the terms of the Plan document, within the

meaning of ERISA § 402(a), 29 U.S.C. § 1102(a).

40.     The Schedule H, Line 4i, Schedule of Assets (Held at End of Year) in the Plan's

Forms 5500 represent that PLM is a party in interest to the Plan.

41.    PLM is and was at the time of the ESOP Transaction a party in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14).

42.    PLM and 360 Merchandising employees who are not "Leased Employees" and are not covered by a collective bargaining agreement, or who are covered by a collective bargaining agreement that specifically refers to the ESOP and provides for coverage under the Plan, must meet two requirements to participate in the Plan: (1) be age 21 or older; and (2) complete at least 1,000 Hours of Service within their initial Employment Year or any Plan Year thereafter.

43.    PLM employees do not have a choice whether to participate in the Plan as part of their compensation package or to choose other compensation for their labor. Participation in the Plan is automatic and employees cannot change or stop their participation in the Plan while employed at PLM and 360 Merchandising. The Plan's SPD informs participants: "Once you meet these requirements, you will automatically become a Participant on the following January 1 or July 1 (each, an *Entry Date*"), if you remain employed by the Employer on that date. . . . You do not have to take action to enroll in the ESOP, and you may not change or stop your participation in this Plan during your employment by the Employer."

44.    Plaintiffs were automatically enrolled in the Plan under the Plan's terms, without their election or assent. Because they worked sufficient Hours of Service, Plaintiffs were allocated PLM stock to their Plan accounts during their employment, in which they were vested under the Plan's terms.

45.    Plaintiffs' efforts on the job played a role in the value of the PLM stock owned by the Plan and allocated to participants' individual accounts, including their own. The SPD acknowledges: "each ESOP Participant plays an important role in determining P.L. Marketing's

financial performance. This is the direct link between your efforts on the job and the value of your ESOP Account." The SPD states further: "your efforts influence the future success of P.L. Marketing, Inc.; those efforts now also influence the value of your retirement Account in the ESOP." And it states: "With the ESOP, you now share in the benefits of the Company's growth and profitability as well as enjoy competitive pay and other benefits."

46.     PLM appointed Horizon as Trustee of the Plan prior to the ESOP Transaction, at a time when Selling Shareholders owned the company and controlled it as the sole directors and senior officers. As Trustee, Horizon had sole and exclusive authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for PLM stock. Selling Shareholders, who were the seller-side in the ESOP Transaction, therefore appointed the buyer-side counter-party trustee in the Transaction.

47.     "[T]he ESOP world [is] a very incestuous community" because of the "significant long-term business relationships" resulting from parties working together in many ESOP deals, and ESOP trustees maintain "extensive and lucrative business relationships" with seller-side advisors. *See Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 771, 779 (4th Cir. 2019) (citation omitted). Selling Shareholders, through PLM, appointed Horizon to be the buyer-side trustee on advice of their seller-side ESOP advisors. An unconflicted independent fiduciary did not make the appointment.

48.     Horizon received fees from PLM for its services as transaction trustee in the ESOP Transaction to the buyer-side Plan under a contract made under Selling Shareholders' ownership and control of PLM. Horizon also received fees after the ESOP Transaction because it was appointed ongoing trustee to the Plan. Horizon was rewarded with engagement as the Plan's

ongoing trustee by Selling Shareholders, who controlled PLM, having completed the ESOP Transaction to their satisfaction.

49.     The Notes to Financial Statements of the Plan's 2017 Form 5500 explains that the Plan's administrative expenses for 2017 were paid by PLM.

50.     As Trustee for the Plan, it was Horizon's duty to ensure that any transactions between the Plan and Selling Shareholders and between the Plan and PLM, including acquisitions of PLM stock by the Plan and loans to the Plan, were fair and reasonable and to ensure that the Plan paid no more than fair market value.

51.     On June 6, 2017, the Plan purchased from Selling Shareholders 1,000,000 shares of PLM's common stock for $53,000,000. At that time, PLM became 100% employee owned through their ESOP.

52.     The Plan's purchase of the PLM shares was financed by a loan from PLM of $53,000,000, bearing an interest rate of 3.50%, annually, to be repaid over 20 years.

53.     The parties resorted to financing by seller-controlled PLM because they were unable to arrange bank financing for the ESOP Transaction. Prospective bank lenders would have been troubled by the fact that the proposed ESOP Transaction would be 100% leveraged. A prudent bank would not have financed the transaction at the $53,000,000 value without conducting robust due diligence on the loan to ensure that the collateral pledged, the stock, was actually worth $53,000,000. Because the parties could not obtain, or knew they could not obtain, bank financing for the transaction, they "financed" the transaction themselves with a note payable. The loan was not primarily for the benefit of participants and beneficiaries of the plan, but rather was arranged in the interest of Selling Shareholders to provide the liquidity enabling

them to divest themselves of PLM with the Plan's purchase of their shares in the prohibited and imprudent ESOP Transaction.

54.     The Notes to Financial Statements in the Plan's Forms 5500 report that the Plan's investment in PLM common stock and indebtedness to PLM were party-in-interest transactions.

55.     The Plan's 2017 and 2018 Forms 5500s were signed by Defendant Logsdon on behalf of PLM, as plan administrator, under penalty of perjury. The Plan's 2019 and 2020 Forms 5500 were signed by PLM Vice President Nicholas Basch on behalf of PLM, as plan administrator, under penalty of perjury.

56.     Selling Shareholders were Directors of PLM prior to the ESOP Transaction, at the time of the 2017 ESOP Transaction, and after the ESOP Transaction to the present. Defendant Schuh was the President of PLM prior to and at the time of the ESOP Transaction, and Defendant Logsdon became the President of PLM within a year after the ESOP Transaction and held that title or the title of Chief Executive Officer (CEO) until in or about 2020. At the time of the ESOP Transaction, Defendant Logsdon was PLM's Secretary and Vice President. Selling Shareholders were very involved in the management of PLM.

57.     Selling Shareholders were centrally involved in conceiving of, facilitating, and executing the ESOP Transaction. They were involved in directing the preparation of financial statements and projections by their team of subordinate PLM management for use in valuations in the Transaction, and approving PLM's lending of $53,000,000 in the fully leveraged transaction.

58.     Two additional PLM Directors were appointed after the ESOP Transaction. Selling Shareholders at all relevant times controlled PLM through their status as Directors, their authority and/or influence in appointing Directors, due to the company debt they held as sellers

in the ESOP Transaction, through a compliant trustee that could be fired by PLM or its board of directors, due to the officer positions they held or otherwise controlled by appointment. PLM's current senior officers are former lieutenants of Selling Shareholders during their presidencies.

59.     The Plan and its participants did not take control of PLM from Selling Shareholders in the transaction conceived and effectuated by Selling Shareholders, their ESOP advisors, and Horizon.

60.     Horizon valued PLM stock on a control basis by using an industry capital structure instead of PLM's actual capital structure in its income method, which yielded a control value. But the Plan did not obtain control of PLM, as explained above, because Selling Shareholders maintained control over the board of directors and, through the board, the company. The Plan should have received a discount for lack of control, but it did not. This means the Plan paid more than fair market value for the stock.

61.     Horizon's appraisal of PLM stock in the ESOP Transaction used income valuation techniques. PLM management provided financial statements and projected cash flows and earnings to the Trustee for the valuation in the ESOP Transaction. The financial projections were unreasonably optimistic. The Plan overpaid for PLM stock in the ESOP Transaction due to the Trustee's reliance on unrealistic growth projections. The Trustee did not adequately challenge information provided by PLM management or the valuation techniques of its financial advisor and therefore failed to negotiate for the true, lower fair market value price of PLM stock as of the date of the ESOP Transaction.

62.     PLM has long touted its overreliance exclusively on Kroger's business as an advantage. For example, PLM's website states: "**We Are Loyal.** We are loyal to each other, to Kroger and their valued suppliers. We do not have divided interests. We are not beholden to or

13

distracted by other clients. P.L. Marketing is 100% dedicated to The Kroger Co. and their valued

suppliers. We know exactly who we serve and that creates an exceptional level of dedication and

commitment."

63.     PLM's subsidiary 360 Merchandising likewise touts on its website that it is:

"Proudly and **Exclusively Servicing** the Kroger Family."

64.     There is danger inherent in this business model of reliance on a single customer,

which was realized here.

65.     In the months leading up to the ESOP Transaction and after the ESOP

Transaction, in addition to decreasing the number of employees, PLM reduced the number and

size of its teams and decreased the number of open positions. In the months leading up to the

ESOP Transaction and after the ESOP Transaction, PLM's new store projects and store remodels

were cancelled or further delayed.

66.     PLM's overreliance on Kroger culminated in 2020 with a reduction in force at

PLM of approximately 40% when Kroger did not renew contracts. The notes to the financial

statements in the Plan's 2019 Form 5500, filed on October 12, 2020, stated: "During 2020,

several service contracts with the Company's main customer were not renewed. This nonrenewal

is expected to result in a reduction of gross sales of the Company."

67.     The notes to the financial statements in the Plan's 2020 Form 5500, filed on

October 13, 2021, stated: "During 2020, several service contracts with the Company's main

customer were not renewed. This nonrenewal resulted in a significant reduction of the

Company's workforce. Under ERISA, a partial plan termination may occur if a significant

percentage of the Plan participants are terminated due to actions taken by the Plan Sponsor. The

workforce reduction of approximately 40% of the Company's employees constituted a partial

plan termination as defined by ERISA, which occurs if 20% or more of plan participants are terminated."

68.     PLM's lost contracts with Kroger resulted in PLM no longer serving all Kroger divisions, losing four single-source divisions, and reduced Our Brands retail support.

69.     PLM issued Worker Adjustment and Retraining Notification Act ("WARN") notices in 2020. PLM reported the layoffs or furloughs were permanent and cited a contract loss as the rationale. The affected workers were distributed across several states, including Kentucky, Ohio, Indiana, and West Virginia.

70.     Horizon's appraisal of PLM stock in the ESOP Transaction used market valuation techniques. The appraisal derived value based on supposedly comparable companies to PLM. But the selected comparable companies were too dissimilar to PLM to provide a reliable indication of value. Moreover, the discounts applied to the selected multiples derived from the purportedly comparable companies were arbitrary and insufficient to reflect the fair market value of PLM, yielding a market based value that substantially overstated the fair market value of PLM. Among other things, selected comparable companies were not reliant on the business of a single customer. Thus, the use of market comparables that were not a good match to PLM caused the stock to be overvalued and the ESOT to overpay.

71.     Horizon relied on a guideline public company method that greatly overstated value for several reasons. First, the differences in size between PLM and selected guideline companies was vast. PLM's enterprise value is one tenth to one fifteenth the enterprise value of selected guideline public companies. Because of their larger size and because they trade on an efficient, public market with public financials, these large firms have much better access to capital and much better financing terms. Second, these much larger firms have a wide range of

clients, whereas PLM has only Kroger. Third, these firms have a much more diversified set of products and services, whereas PLM does one thing – help Kroger with in-store marketing. For these reasons, applying median or mean multiples from the guideline companies vastly overstates PLM's value. Arbitrarily discounting the median or mean selected multiples to bring the guideline value in-line with the discounted cash flow (DCF) method yields an unreliable measure of value and a false corroboration that the DCF represents fair market value.

72.     Horizon failed to apply a sufficient discount for lack of marketability (DLOM) to its valuation in the ESOP Transaction because it failed to sufficiently account for the lack of marketability for the stock that was purchased by the ESOT. The valuation applied an insufficient DLOM because Plan participants, beneficial owners rather than legal owners, have a right to demand that the company buy any shares of its stock distributed to participants for which there is no market (the "put option"). But the Plan was the purchaser in the ESOP Transaction and the participants' put option did not reduce the lack of marketability to the ESOT of the stock the ESOT owned. In addition, the Plan's lack of control over PLM made it lack marketability. The Plan overpaid for PLM stock in the ESOP Transaction due to Horizon's improper application of DLOM.

73.     In breach of their duty of loyalty to plans and their participants and beneficiaries, ESOP trustees have defined and employed deficient "industry" standards for themselves alone that deviate from sound business practices employed by non-ESOP buyers in the so-called "real world" and required by ERISA. In accordance with its and "industry" routine practices, Horizon's due diligence in the ESOP Transaction was less extensive and thorough than the due diligence performed by third-party buyers in corporate transactions of similar size and complexity. Incentives to Horizon to fail to exercise care, skill, prudence and diligence in the

interest of Plan participants and beneficiaries in the ESOP Transaction by failing to apply sound business principles of evaluation and to conduct a prudent investigation and negotiation included the possibility of business from sellers of companies who understood that Horizon applied a lesser degree of due diligence in ESOP purchases of businesses than is typical for non-ESOP-buyers' purchases of businesses, referrals for such work by other service providers in the ESOP creation and administration business, and engagement as the Plan's ongoing trustee after the ESOP Transaction and the fees paid for that engagement.

74.     The Plan suffered losses due to the overvaluation of PLM stock in the ESOP Transaction and its overpayment for the stock, in an amount to be determined following discovery and expert analysis of non-public information concerning Horizon's and its financial advisor's valuation and due diligence methodologies, PLM financials and growth projections, and other documents and information that were considered or should have been considered in the ESOP Transaction.

75.     Due to the Plan's overpayment, the Plan's participants, whose losses are coterminous with the Plan's, received diminished stock allocations, saw their Plan take on excessive debt to finance the Transaction, and suffered losses to their individual Plan accounts.

76.     Horizon is liable to the Plan for the difference between the price paid by the Plan and the fair market value of PLM shares at the time of the ESOP Transaction.

77.     Selling Shareholders are liable to the Plan to repay the difference between the price they received and the fair market value of their PLM shares at the time of the ESOP Transaction.

## CLAIMS FOR RELIEF

## COUNT I

### Causing Prohibited Transactions Forbidden by
### ERISA § 406(a), 29 U.S.C. § 1106(a), Against Horizon

78.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

79.     ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary, here Horizon, from causing a plan, here the Plan, to engage in a sale or exchange of any property, here PLM stock, with a party in interest, here Selling Shareholders, as took place in the ESOP Transaction.

80.     ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits Horizon from causing the Plan to borrow money from a party in interest, here PLM, as took place in the ESOP Transaction.

81.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits Horizon from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest, here Selling Shareholders, of any assets of the Plan, as took place in the ESOP Transaction with the direct or indirect transfer of Plan assets to Selling Shareholders as payment for PLM stock.

82.     The stock and loan transactions between the Plan and the parties in interest were authorized by Horizon in its capacity as Trustee for the Plan.

83.     Horizon caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), in the ESOP Transaction.

84.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the

18

plan any losses to the plan resulting from each such breach, and to restore to the plan any profits

of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and

additionally is subject to such other equitable or remedial relief as the court may deem

appropriate.

85.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a

suit for relief to a plan under ERISA § 409.

86.     Horizon has caused losses to the Plan by the prohibited transactions in an amount

to be proved specifically at trial.

## COUNT II

**Breaches of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a),
Against Horizon**

87.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

88.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan

fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants

and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the

beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with

the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

person acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims, and (D) in accordance with the documents and

instruments governing the plan insofar as such documents and instruments are consistent with

ERISA.

89.     The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to

resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye

single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

90.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

91.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

92.     Horizon was required to undertake an appropriate and independent investigation of the fair market value of PLM stock in or about June 2017 in order to fulfill its fiduciary duties, and an appropriate investigation would have revealed that the valuation used for the ESOP Transaction did not reflect the fair market value of the PLM stock purchased by the Plan.

93.     Horizon was required to act independently on behalf of the Plan, to probe projections and other information provided by PLM management, and it did not adequately do so.

94.     Horizon was required to negotiate for the Plan to pay no more than fair market value for PLM stock in the ESOP Transaction, and it failed to do so, but instead approved the imprudent Transaction.

95.     Horizon breached its duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

96.     Horizon has caused losses to the Plan by its breaches of fiduciary duty in an amount to be proved specifically at trial.

## COUNT III

### Knowing Participation in ERISA Violations Pursuant to 29 U.S.C. § 1132(a)(3), Against Selling Shareholders

97.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

98.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), *inter alia*, permits a plan participant to bring a civil action to obtain appropriate equitable relief to redress violations of the provisions of Title I of ERISA, or to enforce the provisions of Title I of ERISA or the terms of a plan.

99.     The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

100.    As a result of the prohibited stock transaction described above, Selling Shareholders received Plan assets in payments above fair market value for their PLM stock.

101.    Selling Shareholders were parties in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14), as described above.

102.    Selling Shareholders knew or should have known (1) about the existence of the Plan, (2) about the Plan's purchase, directly or indirectly, of their PLM stock in the ESOP Transaction, (3) that Horizon was the fiduciary trustee to the Plan, (4) that they were PLM officers and directors or otherwise parties in interest to the Plan as 10% or more shareholders or as 360 Merchandising officers or directors or individuals with similar powers and

responsibilities, and (5) that Horizon caused the Plan to engage in the prohibited stock transaction.

103.    As parties to the stock purchase agreement containing the terms of the Plan's stock purchase from Selling Shareholders and countersigned by Horizon on behalf of the ESOT, as the sellers of $53 million in stock with an interest in having knowledge of and competently negotiating the Transaction, as officers and directors of PLM which chose Horizon to be the Plan Trustee and bore a fiduciary duty to monitor, and as officers and directors of PLM which participated in the loan component of the transaction under their authorization, Selling Shareholders were aware of sufficient facts that the ESOP Transaction constituted a prohibited transaction. Selling Shareholders are liable for knowingly participating in violations of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), alleged in Count I.

104.    As a result of the ERISA § 404(a) breaches of fiduciary duty described above, Selling Shareholders received Plan assets in payments above fair market value for their PLM stock.

105.    Selling Shareholders knew or should have known that the Plan overpaid for PLM stock and that Horizon's investigation was inadequate. PLM management working under Selling Shareholders provided company information to the buyer side. Selling Shareholders, through PLM, appointed Horizon as fiduciary trustee, and thus had a duty to monitor. Selling Shareholders, as the senior PLM officers and as directors, knew or should have known facts regarding the scope of Horizon's due diligence, the overly optimistic projections and other information provided to Horizon and its advisors by PLM, and company valuations, sufficient to give them knowledge of Horizon's investigatory and valuation deficiencies and that the Plan overpaid. Selling Shareholders knew or should have known such facts as seller participants in the

Transaction, and because PLM itself participated in the loan transaction. PLM could not give a $53 million loan without due diligence known to the senior officers and directors and without their approval.

106.     Selling Shareholders are liable for the violations alleged in Count II.

107.     Selling Shareholders profited from the prohibited stock transaction and breaches of fiduciary duty in an amount to be proven at trial, and upon information and belief, they remain in possession of some or all of the assets that belong to the Plan.

108.     Selling Shareholders are subject to appropriate equitable relief including disgorgement of any ill-gotten gains they received in connection with the ESOP Transaction, accounting for profits, having a constructive trust placed on any proceeds received (or which are traceable thereto), reformation of the ESOP Transaction contracts to provide the Plan pays no more than fair market value for PLM stock as of the date of the Transaction and to give the Plan powers or other consideration for which it paid but did not receive, having the transaction rescinded, requiring all or part of the consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## **COUNT IV**

### **Declaratory Judgment Under 28 U.S.C. §§ 2201–2202 Against All Defendants**

109.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

110.     On January 12, 2023, Defendants filed in this lawsuit a copy of the P.L. Marketing, Inc. Employee Stock Ownership Plan and Trust Agreement (Effective January 1, 2017) (the "Plan Document") (ECF No. 21-1) with their Motion to Dismiss (ECF No. 21) the initial Complaint. Prior to that date, and specifically at the time they filed this lawsuit on October 5, 2022, Plaintiffs did not have possession of the Plan Document.

111.    Sections 7.6 to 7.9 of the Plan Document are the Plan's arbitration provisions (the "Arbitration Clause"), under which Defendants claim this lawsuit is subject to mandatory arbitration.

112.    Section 7.7(f) of the Arbitration Clause provides:

> No Class Arbitration or Class Relief. Each Participant and Beneficiary, or any party claiming for or through them, agrees that any Claims will be arbitrated individually and shall not be brought, heard, or arbitrated on a class or collective action basis – unless both parties agree, in writing, to the contrary.

In this lawsuit Defendants interpret Section 7.7(f) to allow arbitration only of claims for relief to an individual plaintiff-participant, including the individual plaintiff's account in the Plan, and to bar a plaintiff from seeking in arbitration relief to the Plan that would benefit other participants and beneficiaries and their Plan accounts. Plaintiffs do not concede the accuracy of Defendants' interpretation of Section 7.7(f).

113.    Section 7.8 of the Arbitration Clause contains a non-severability provision (the "Non-Severability Clause"), which provides:

> Severability. Except for the provisions set forth above in Sections 7.6 and 7.7(f) which are not severable from this arbitration agreement, the other provisions of this arbitration agreement are severable, and if any part of these other provisions is held unenforceable, the remaining parts shall remain valid and enforceable. If a court decides that Sections 7.6 or 7.7(f) are unenforceable and there is no right of appeal or such right has expired, any and all rights created by this arbitration agreement shall be voided retroactively, and the proceeds of any award must be returned to the party from which they originated.

Under the Non-Severability Clause, should the Court hold Section 7.7(f) is unenforceable, the entire Arbitration Clause is void.

114.    Counts I and II seek relief from Horizon to the Plan as a whole pursuant to ERISA §§ 409(a) and 502(a)(2). Count III, a "derivative" claim to the § 502(a)(2) claims in Counts I and II, seeks relief, primarily disgorgement, from Selling Shareholders to the Plan as a whole

24

pursuant to ERISA § 502(a)(3). The § 409(a) relief of "any losses to the plan" sought in this lawsuit under § 502(a)(2) would benefit not only Plaintiffs but other participants and beneficiaries because the alleged injury to the Plan did not injure only Plaintiffs' Plan accounts but also the accounts of other participants who were vested in PLM stock purchased by the Plan in the ESOP Transaction. Requested equitable relief to the Plan—such as removal of fiduciaries and enjoining of fiduciaries from serving as fiduciaries to PLM plans, rescission of the ESOP Transaction, and reformation of Transaction contracts—would also benefit participants and beneficiaries other than Plaintiffs.

115.    Section 7.7(f), as interpreted by Defendants, is unenforceable. Pursuant to the Non-Severability Clause, Section 7.7(f) is not severable from the Arbitration Clause. The Arbitration Clause is therefore void by its own terms.

116.    Section 7.9 of the Arbitration Clause provides: "Enforcement. This Agreement and the arbitration award are enforceable and subject to federal law and the Federal Arbitration Act, 9 U.S.C. § 1, et seq."

117.    Section 7.7(f) of the Arbitration Clause as interpreted by Defendants prohibits relief that ERISA expressly permits; operates as a prospective waiver of Plaintiffs' right to pursue statutory remedies; prevents effective vindication of statutory rights; is an unlawful exculpatory provision under ERISA § 410(a), 29 U.S.C. § 1110(a); and is unconscionable.

118.    An actual and justiciable controversy has arisen between Defendants and Plaintiffs concerning the arbitrability of Plaintiffs' claims. Accordingly, as alleged herein, a real and substantial, and immediate controversy is presented regarding the rights, duties and liabilities of the parties. A judicial declaration that Section 7.7(f) of the Plan Document is unenforceable or

the Arbitration Clause is void pursuant Section 7.8 will resolve part of the present controversy and provide conclusive relief.

119.     Plaintiffs therefore seek a declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, declaring that Section 7.7(f) of the Plan Document is unenforceable to the extent it allegedly bars the statutory relief to the Plan sought in Plaintiffs' representative claims brought on behalf of the Plan, Defendants are barred from enforcing the Arbitration Clause in the Plan Document by operation of its Non-Severability Clause, and/or that the Arbitration Clause is void.

## CLASS ACTION ALLEGATIONS

120.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the following class:

> All vested participants in the P.L. Marketing, Inc. Employee Stock Ownership Plan ("Plan") and the beneficiaries of such participants as of the date of the June 6, 2017 ESOP Transaction or anytime thereafter. Excluded from the Class are the shareholders who sold their P.L. Marketing, Inc. ("PLM") stock to the Plan, directly or indirectly, and their immediate families; the directors and officers of PLM and their immediate families; and legal representatives, successors, and assigns of any such excluded persons.

121.     The Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of Class members are unknown to Plaintiffs at this time, the Plan's 2020 Form 5500 filing reported that as of December 31, 2020, there were 1,964 participants in the Plan, and the Plan's most recent Form 5500 filing reports that as of December 31, 2021, there were 1,448 participants in the Plan.

122.     Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

  i.     Whether Horizon served as Trustee in the Plan's acquisition of PLM stock;

ii.      Whether Horizon was an ERISA fiduciary of the Plan;

iii.     Whether Horizon caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to purchase PLM stock and take loans from parties in interest;

iv.     Whether Horizon engaged in good faith valuations of the PLM stock in connection with the ESOP Transaction;

v.     Whether Horizon caused the Plan to pay more than fair market value for PLM stock;

vi.     Whether Horizon breached its fiduciary duty to undertake an appropriate and independent investigation of the fair market value of PLM stock on or about June 6, 2017;

vii.     Whether PLM was a party in interest and gave a loan to the Plan;

viii.     Whether Selling Shareholders were parties in interest;

ix.     Whether Selling Shareholders knowingly participated in the prohibited stock transaction and breaches of fiduciary duty;

x.     The amount of losses suffered by the Plan and its participants as a result of Horizon's ERISA violations; and

xi.     The appropriate relief for Defendants' violations of ERISA.

123.    Plaintiffs' claims are typical of those of the Class. For example, Plaintiffs, like other Plan participants in the Class, suffered a diminution in the value of their Plan accounts because the Plan paid above fair market value and took on an excessive loan for PLM stock, resulting in them being allocated fewer shares of stock, and they continue to suffer such losses in the present because Horizon failed to correct the overpayment by the Plan.

124.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions, ERISA, and employee benefits litigation.

125.    Class certification of Plaintiffs' Claims for Relief for the alleged violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members, and/or because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Horizon.

126.    The names and addresses of the Class members are available from the Plan. Notice will be provided to all members of the Class to the extent required by Fed. R. Civ. P. 23.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    Declare that Defendant Horizon caused the Plan to engage in prohibited transactions and thereby breached its duties under ERISA;

B.    Declare that Defendant Horizon breached its fiduciary duties under ERISA to the Plan and the class members;

C.    Declare that Selling Shareholders knowingly participated in a prohibited transaction with the Plan and Horizon's breaches of fiduciary duty in violation of ERISA;

D.    Order Defendants to make good to the Plan and/or to any successor trust(s) the losses resulting from the violations of ERISA and disgorge any profits they made through use of assets of the Plan;

28

E.      Order reformation of the ESOP Transaction contracts to provide the Plan pays no more than fair market value for PLM stock as of the date of the transaction, to provide the Plan receives that for which it paid including control of PLM where it did not receive a discount for lack of control and did not obtain control of the PLM board of directors under contractual governance provisions, and any other appropriate reformation;

F.      Order rescission of the ESOP Transaction;

G.      Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including but not limited to surcharge by any fiduciary defendant, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

H.      Order the proceeds of any recovery for the Plan to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

I.      Order the allocation to the accounts of the class members of the additional shares of stock that would have been allocated but for the Plan's overpayment on company stock and Defendants' breaches of ERISA;

J.      Enjoin Horizon and its current or former personnel who approved the ESOP Transaction from acting as a fiduciary for any employee benefit plan that covers or includes any PLM employees or members of the Class;

K.      Remove as Plan trustee and fiduciary any purchaser of Horizon's ESOP business and/or any Plan trustee appointed by Selling Shareholders, including but not

limited to GreatBanc Trust Company, and any former personnel of Horizon who approved the ESOP Transaction, enjoin such persons from acting as a fiduciary for any employee benefit plan that covers or includes any PLM employees or members of the Class, and appoint an independent fiduciary as Plan trustee;

L.     Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

M.    Enjoin Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the Plan participants' rights can be adjudicated;

N.    Enjoin Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the Plan participants' ability to recover the same;

O.    Order Defendants to pay prejudgment and post-judgment interest;

P.    Declare that the provisions in the Plan relating to mandatory arbitration are void and unenforceable because they prevent effective vindication of statutory rights under ERISA;

Q.    Declare that the provisions in the Plan relating to mandatory arbitration are void and unenforceable as an unlawful exculpatory agreement under ERISA;

R.    Declare that the provisions in the Plan relating to mandatory arbitration are void and unenforceable as unconscionable;

S.    Declare that Defendants are barred from enforcing the provisions in the Plan relating to mandatory arbitration;

T.      Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiffs as class representatives and their counsel as class counsel; and

U.      Award such other and further relief as the Court deems equitable and just.

Dated:    February 2, 2023

Respectfully submitted,

**BAILEY & GLASSER LLP**

<u>/s/ Christina T. Natale</u>
Christina T. Natale
Gregory Y. Porter (*pro hac vice*)
Ryan T. Jenny (*pro hac vice*)
1055 Thomas Jefferson St., NW
Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
cnatale@baileyglasser.com
gporter@baileyglasser.com
rjenny@baileyglasser.com

*Attorneys for Plaintiffs*

31

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of February 2023, a copy of the foregoing document was served on all counsel of record via ECF.

*/s/ Christina T. Natale*
Christina T. Natale